UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– against –

E.L.,

Defendant.

15-CR-137

**Statement of Reasons for
Sentencing Pursuant to 18 U.S.C.
§ 3553(c)(2)**

**Appearances**

**Defendant**

Mildred M. Whalen
Michael Daniel Weil
Federal Defenders of New York, Inc.

**United States**

Robert L. Capers
United States Attorney, E.D.N.Y.
By: David K. Kessler

JACK B. WEINSTEIN, Senior United States District Judge:

## Table of Contents

I.  Introduction ........................................................................................................ 2
    A.  Instant Case ................................................................................................ 2
    B.  Consistency in Sentencing ......................................................................... 4
II. Facts and Procedural History ......................................................................... 4
    A.  Background ................................................................................................. 5
    B.  Sexual History ............................................................................................ 6
    C.  Child Pornography ..................................................................................... 6
    D.  Arrest .......................................................................................................... 7
    E.  Mental Health Treatment ........................................................................... 8
    F.  Guilty Plea ................................................................................................. 9
III. Sentencing Hearing ...................................................................................... 10
    A.  Medical ...................................................................................................... 10
        1.  Alexander S. Bardey, M.D. ................................................................ 10
            a)  Credentials .................................................................................. 10
            b)  Evaluation .................................................................................... 11
            c)  No Risk of Contact Offense ........................................................ 12
            d)  Low Recidivism Risk with Treatment ........................................ 15
        2.  Larry Menzie, LCSW ........................................................................ 17
    B.  Social Worker ............................................................................................ 18
    C.  Wife ........................................................................................................... 20
IV. Sentence Imposed .......................................................................................... 20
V.  Sentencing Law .............................................................................................. 22
    A.  Discretion of Sentencing Judge ................................................................ 22
    B.  Applicable Statute ..................................................................................... 22
    C.  Advisory Nature of the Sentencing Guidelines ........................................ 23
        1.  Section 3553(a) Factors .................................................................... 23
        2.  Departures Based on Disagreement with Commission Policy ........... 25
        3.  Statement of Reasons Required ......................................................... 25
    D.  Restitution ................................................................................................. 26
VI. Application of Law to Facts .......................................................................... 28
    A.  Guidelines Sentencing Range ................................................................... 28

    **B.**   **Analysis of Section 3553(a) Factors** ................................................................. 29

        **1.**   **Circumstances of Offense; Characteristics of Defendant** ..................................... 29

        **2.**   **Purposes of Sentencing** .......................................................................... 31

        **3.**   **Kinds of Sentences Available** .................................................................. 36

        **4.**   **Guidelines, Policy, and Other Criteria of Sentencing Commission** ..................... 36

        **5.**   **Unwarranted Sentence Disparities** ........................................................... 38

    **C.**   **Policy Considerations** .............................................................................. 40

**VII.**   **Conclusion** .................................................................................................. 43

## I.    Introduction

### A.    Instant Case

This case underscores the unreasonableness of current child pornography sentencing patterns, and the excessive incarceratory terms recommended by the Sentencing Commission. The law in this field is overdue for revisiting.

Defendant pled guilty to one count of possession of child pornography in violation of sections 2252(a)(4)(B) and 2252(b)(2) of title 18 of the United States Code. The Guideline sentence was *51 to 63 months* in prison. Imposed was a sentence of five years of probation with substantial and adequate continuing controls and treatment to protect the public. *See infra* Part IV.

Defendant admits to having downloaded on his computer images involving young girls— most between twelve and fourteen years old—posing naked, engaging in "lascivious display." He first viewed and downloaded adult pornography during a period of depression and isolation when he was unemployed and separated from his family. This led to viewing child pornography. There is no evidence that defendant ever produced such materials, or that he took any steps towards engaging in any kind of inappropriate contact with a minor.

The court conducted an extensive *Fatico* evidentiary hearing before sentencing. Convincing medical and expert testimony demonstrated that defendant poses no current or future

risk to any child. He has been successfully engaged in psychological and sex offender treatment for a year. Experts testified that treatment required by the court will decrease his already low risk of re-engaging in any sex offense.

Possession of child pornography is a serious crime. "The theory is that (1) computer depiction of children being sexually exploited creates a permanent widespread record of abuse, perpetuating and potentially exacerbating the harm initially suffered by the victim in the production, and (2) acquisition of these images encourages abuse of children in their production since viewers create demand." *United States v. R.V.*, -- F. Supp. 3d --, 2016 WL 270257, at *1 (E.D.N.Y. Jan. 21, 2016).

No mandatory minimum applies to the instant offense. The sentencing factors under section 3553(a) of title 18 of the United States Code require a sentencing judge to perform an "individualized assessment" of the situation. *See* 18 U.S.C. § 3553(a); *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Analysis is guided by "[r]easonableness" and an "*individualized* application of the statutory sentencing factors." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall*, 552 U.S. at 46-47) (emphasis added).

The judge's sense of proportionality must be applied. In the present case, a sentence of probation, with strict controls and required continuing treatment, is appropriate. Defendant's life will always be shadowed by the stain of a federal felony conviction for a sex-related crime. Extensive restrictions affecting where he can live and work, and how he will be controlled, will follow him. An incarceratory Guidelines sentence would have an adverse impact on the substantial progress that defendant has already made through his participation in individual and group therapy. It will deprive his family of vital financial and emotional support while doing little to further protect the public. It will unnecessarily add to taxpayers' burdens.

## B. Consistency in Sentencing

This court has been attempting to rationalize its own sentences by establishing general criteria for similar cases, a project required by the wide discretion in sentencing afforded under *United States v. Booker*, 543 U.S. 220 (2005). *See, e.g.*, *United States v. Chin Chong*, 13-CR-570, 2014 WL 4773978, at *1 (E.D.N.Y. Sept. 24, 2014) (accounting for prospect of deportation when imposing a term of incarceration); *United States v. Sarpong*, No. 14-CR-242, 2014 WL 5363775, at *2 (E.D.N.Y. Oct. 21, 2014) (same); *United States v. Palaguachy*, No. 14-CR-0184, 2014 WL 6606668, at *2 (E.D.N.Y. Nov. 19, 2014) (same); *United States v. Florez Parra*, No. 14-CR-332, 2015 WL 105885, at *2 (E.D.N.Y. Jan. 7, 2015) (same); *United States v. D.M.*, 942 F. Supp. 2d 327, 352 (E.D.N.Y. 2013) (sentencing defendant who pled guilty to one count of possession of child pornography to five years' probation); *R.V.*, 2016 WL 270257, at *14 (sentencing defendant who pled guilty to one count of possession of child pornography to time served and seven years' supervised release); *see also United States v. G.L.*, 305 F.R.D. 47, 48 (E.D.N.Y. 2015) ("With the increase in sentencing discretion and concern over unnecessarily long incarcerations has come an increased need for each judge to try to avoid inconsistency in his or her own sentences. Stating reasons for sentencing in memoranda helps minimize both dangers.").

## II. Facts and Procedural History

Defendant will be referred to by his initials, "E.L.," to enhance rehabilitation and reduce adverse impact on his family, in particular harm to his young children. *See R.V.*, 2016 WL 270257, at *4.

Relevant information has been derived primarily from a comprehensive *Fatico* hearing and the Presentence Investigation Report ("PSR") submitted by the Department of Probation. *See* PSR, Feb. 9, 2016; Def.'s Objections to PSR, Mar. 19, 2016, ECF No. 35 ("PSR Objections"); Hr'g Tr.,

Mar. 23, 2016, ECF No. 42 ("Sent. Hr'g"), at 137:10-24 (incorporating defendant's corrections to the PSR).

A.    **Background**

E.L. is a fifty-one year old male residing in Brooklyn.  *See* PSR at 2.  He was raised in Yonkers, New York, primarily by his maternal grandmother, since both of his parents were alcoholics.  *Id.* at ¶¶ 36, 44; PSR Objections at ¶ 3.  His mother was abusive.  PSR at ¶ 44.  She died from liver failure and his father died from lung cancer.  *Id.* at ¶ 35.  He has no siblings.  *Id.*

He graduated from Lincoln High School in Yonkers.  *Id.* at ¶ 54.  He received a bachelor's degree in computer information systems from Mercy College.  *Id.* at ¶ 53.  He worked for several years as a computer programmer, with intermittent periods of unemployment.  *See id.* at ¶¶ 56-58.  Since 2012, defendant has been employed as a senior information technology consultant in Brooklyn.  *Id.* at ¶ 55.

E.L. is married and has nine year old twin boys.  *Id.* at ¶ 38.   He is the sole financial provider for the family.  *Id.*  In addition to his wife and children, E.L. furnishes financial support to his mother-in-law and father-in-law.  *See* PSR Objections at ¶ 1.  His father-in-law was recently diagnosed with bladder cancer and his mother-in-law is in the early stages of Alzheimer's disease.  *Id.* at ¶ 4.  Defendant's wife and children reside at a home that the family owns in Stroudsburg, Pennsylvania.  PSR at ¶ 37.  The defendant travels there on the weekends from his job in Brooklyn.  The family plans to sell their apartment in Brooklyn to pay debts.  *Id.*; PSR Objections at ¶ 4.

E.L. suffers from hypothyroidism, high cholesterol, acid reflux disease, and osteoporosis.  PSR at ¶ 41.  He was born with Syndactyly—the webbing of hands and feet.  Although partially corrected by surgery, it has left him with painful arthritis in his hands.  *Id*; PSR Objections at ¶ 6.  As a teenager, defendant was treated for scoliosis.  PSR at ¶ 41.  He continues to have a back

problem which decreases his lung capacity and sometimes makes breathing difficult. PSR Objections at ¶ 6.

He has no history of drug or alcohol abuse. PSR at ¶ 52. Apart from the instant offense, he has no convictions. *Id*. at ¶¶ 27-33.

**B.     Sexual History**

Defendant's first sexual relationship was with an adult woman when he was twenty-one. *Id*. at ¶ 43. As he has gotten older, he has experienced some difficulty with intercourse. *Id.*

E.L. stated that in the summer of 2011, while unemployed, he would visit Brighton Beach in Brooklyn, take photographs of people and collect them on his computer. *Id.* He denied voyeurism. *Id.* Some of his subjects "may have been 15 or 16." *Id.*

**C.     Child Pornography**

Defendant reported that he began looking at adult pornography on the Internet while he was unemployed and separated from his family. *Id*. at ¶ 42. He was increasingly depressed and anxious because of his inability to find work. *Id.* He spent more and more time online; downloading movies, watching pornography, and, eventually, downloading child pornography. *Id*.; PSR Objections at ¶ 7.

He denied having a physical sexual interest in children, although he admitted that he was "probably looking for teen" pornography on the Internet. PSR at ¶ 43. He explained that the images he viewed were not violent and looked like "modeling" to him. *Id.* He said he then had a different understanding of child pornography; he now admits he was wrong and understands that what he was doing was more than just viewing "a photo," or "soft porn," with no harm to children. *Id*.

E.L. attempted unsuccessfully to refrain from viewing pornography in 2011. *Id.* He sought help. *Id.*

**D.     Arrest**

Between October 21, 2014, and October 23, 2014, a Federal Bureau of Investigation ("FBI") agent conducted an undercover investigation using a "Bittorrent" application into Internet distribution and possession of child pornography. *Id.* at ¶ 4. "Bittorrent" is a peer-to-peer file sharing software program. *Id.*

During this investigation, the FBI agent located a computer that was sharing child pornography using the "Bittorrent" file sharing network. *Id.* at ¶ 5. The agent downloaded 324 files from a sharing client that had an IP address. *Id.* The downloaded files revealed that almost all of the "Bittorrent" files depicted sexually explicit images of children. *Id.* Several of the files involved prepubescent girls naked and exposing their genitalia. *Id.*

The email address associated with the computer's IP address belonged to E.L.'s wife. *Id.* at ¶ 6. The physical address associated with the computer's IP address was E.L.'s residence in Brooklyn. *Id.*

In November 2014, FBI agents executed a search warrant at defendant's Brooklyn residence. *Id.* at ¶ 7; *see also* PSR Objections at ¶ 2. The majority of the child pornography images found on defendant's computer involved children between the ages of twelve and fourteen years old, posing naked. PSR at ¶ 10. E.L. admitted that he used the "Bittorrent" system to download movies and pornography, including child pornography. *Id.* at ¶ 8.

Defendant was arrested in February 2015. *Id.* at ¶ 10. He was almost immediately released on bail. *See* Minute Entry, Feb. 23, 2015, ECF No. 4.

### E.      Mental Health Treatment

E.L. has had a long history of complex mental health problems.  *See* PSR at ¶¶ 44-51.  He had a nervous breakdown after his mother died, but did not receive treatment.  *Id*. at ¶ 45.  He exhibited obsessive behavior.  He collected items such as baseball cards, newspapers, stamps, and coins.  He continues to collect business cards, paper advertisements, menus, bus schedules, papers, and bills.  *Id*.  He washed his hands constantly.  He bit his nails.  *Id.*

To help control anxiety and depression, in 2009 defendant was treated by a psychiatrist who prescribed Lexapro.  *Id*. at ¶ 46; *see also* PSR Objections at ¶ 8.

After E.L.'s encounter with FBI agents in November 2014, he was severely anxious.  PSR at ¶ 47.  He began therapy with a psychiatrist and was diagnosed with anxiety, depression and obsessive compulsive disorder ("OCD").  *Id*.  Lexapro and Clomipramine were prescribed.  He meets with the doctor once a month.  *Id*.; PSR Objections at ¶ 9.

Over the past year, defendant has been attending weekly group therapy sessions, including sex offender treatment, at Queens Counseling for Change ("QCFC") in Queens, New York.  PSR at ¶ 48; *see also* QCFC, Client Status Summary Report, Feb. 13, 2016, ECF No. 33-2 ("QCFC Report") (sealed).  He believes this regimen has been beneficial and wishes that he had been aware of this kind of help before he was "in trouble."  PSR at ¶ 48.  The result of this ongoing treatment has been described in a December 2015 client summary report as positive:  "defendant's speech was less impulsive, he appeared less anxious, and his verbal boundaries were improving incrementally, in session."  *Id*.  Continued treatment was "strongly recommended" in order to "help maintain safe behavior."  *Id*.

Defendant has also been receiving bi-weekly individual psychotherapy treatment with Dr. Irina Voskoboynik, LCSW-R.  *See* Letter from Irina Voskoboynik, LCSW-R, Jan. 20, 2016, ECF

No. 33-3 ("Voskoboynik Letter") (sealed).  Ms. Voskoboynik finds "Adjustment Disorder with depressed mood.  [E.L.] suffers from a combination of anxious and depressive symptoms, insomnia, disturbed attention and[] concentration, impaired social, executive and daily functioning, low self-esteem, fair judgment and insight into his problems." *Id.*  She notes that defendant "has been making a very good progress during the cognitive-behavioral . . . sessions over the last few months." *Id.*

At the request of defense counsel, Dr. Alexander S. Bardey, a certified forensic psychiatrist, conducted a psychiatric and psychosexual evaluation of defendant, which included an assessment of defendant's risk to the public.  *See* PSR at ¶ 50; Alexander S. Bardey, M.D., Forensic-Psychiatric Evaluation, Aug. 6, 2015, ECF No. 33-1 ("Bardey Report") (sealed).  Dr. Bardey believes defendant is a good candidate for treatment and rehabilitation and considers his risk of re-offending to be low.  PSR at ¶ 50.  He notes that defendant's behavior was restricted to a computer; there is no evidence that defendant has an interest in a contact sexual relationship with a minor.  *Id.*  The doctor reported that defendant does not meet the criteria for a diagnosis of pedophilia, and is not a sexual predator.  *Id.*  He observed that defendant appears to have "an intact moral compass" and noted that at the time of the instant offense defendant felt abandoned by his wife and children:  "With no other outlets, no hobbies other than obsessive collecting, and no friends . . . he turned to the Internet for company." *Id.*

F.    **Guilty Plea**

Defendant pled guilty to a count charging that on November 14, 2014, he possessed visual depictions of minors engaging in sexually explicit conduct contained in digital files, in violation of sections 2252(a)(4)(B) and 2252(b)(2) of title 18 of the United States Code.  *Id.* at ¶ 1.

## III.    Sentencing Hearing

An all-day sentencing evidentiary hearing was conducted.  *See* Minute Entry, Mar. 23, 2016, ECF No. 39.  The parties had been ordered to present expert testimony regarding the risks, if any, posed by defendant to the public.  *See* Order, Feb. 17, 2016, ECF No. 32.

The sentencing proceedings were videotaped to develop an accurate record of the courtroom atmosphere, as well as some of the subtle non-verbal factors that a district court considers in imposing a sentence.  *See In re Sentencing*, 219 F.R.D. 262, 264-65 (E.D.N.Y. 2004) (describing the value of video recording for possible review of sentences on appeal).

### A.    Medical

#### 1.    Alexander S. Bardey, M.D.

##### a)    Credentials

Dr. Alexander S. Bardey, a forensic psychiatrist who evaluated defendant, provided expert testimony.  *See* Sent. Hr'g at 47:7-111:3.  Dr. Bardey graduated from Harvard University with a bachelor's degree in biology and then attended SUNY Stony Brook School of Medicine.  *Id*. at 47:14-15.  He completed a four-year internship and residency at NYU School of Medicine, where he specialized in psychiatry.  *Id*. at 47:16-18.  He was an attending psychiatrist at Bellevue Hospital, first in the emergency room, and then in the Forensic Psychiatry Department, where he served for ten years and eventually became deputy director.  *Id*. at 47:18-24.  For about two years, Dr. Bardey was the director of mental health services at Rikers Island, after which he entered private practice.  *Id*. at 48:3-5.  Over the course of the last thirteen years, he has served as a consultant to the Mental Health Court in Brooklyn as well as to the Department of Mental Health in Nassau County.  *Id*. at 48:5-9.  He is board certified in psychiatry and forensic psychiatry; his training includes "the evaluation and assessment of sex offender[s], specifically around the issue of risk."  *Id*. at 48:13-16.

###### b) Evaluation

Dr. Bardey examined defendant on four occasions—March 19, April 2, April 9, and July 17, 2015. Bardey Report at 1. He also reviewed E.L.'s indictment, criminal complaint, and medical records. *Id*. at 2. He administered the Personality Assessment Inventory ("PAI"), a psycho-diagnostic test, as well as the Abel Assessment for Sexual Interest-3 test ("Abel Test") in order to provide a psychosexual assessment of defendant. *Id*. at 1.

E.L. was diagnosed as suffering from dysthymia, a form of depression of mild to moderate severity, as well as a personality disorder with obsessive compulsive and avoidant features. Sent. Hr'g at 51:19-24.

In evaluating defendant's risk of re-offense, this expert took into account both dynamic factors (which can be managed and mitigated through specific intervention), such as E.L.'s ongoing participation in sex offender therapy, as well as static factors (which do not change over time and are part of an individual's profile), including E.L.'s age and personality disorders. Dr. Bardey explained his analysis as relevant to the evaluation of a person convicted of a sex offense:

> Now, more specific to sexual offenses, especially with individuals who are charged with possession of child pornography, I look to see if there's evidence of two things. One is whether or not the involvement with child pornography is in some sense a portal to additional behaviors. In other words, is this the beginning of a journey that the individual is taking toward eventually committing a contact offense.
>
> And the factors that I look at in doing that is whether or not the individual's behavior was just restricted to the collection and the amassing of images of child pornography, whether there was passive sharing of that pornography through some of the peer to peer programs, whether there was active sharing of the images, whether the individual was chatting with other like-minded individuals and exchanging images and comments with that person, whether the individual was posting on bulletin boards about thoughts or fantasies they had, whether the individual was trying to contact minors directly, either posing as a minor or through some other means, whether the individual actually made attempts to meet with a minor,

and, of course, whether the individual met with a minor. So by
looking at whether any of those behaviors took place, it helps me
then develop a better understanding as to what the risk is of this
individual moving toward an actual contact offense.

The other thing that I look at is what is the risk of the individual
engaging in collecting or viewing child pornography again. And
what I look for in that is whether the individual is a pedophile or not.
Whether those sexual desires are ego-dystonic or ego-syntonic.
What I mean by that is, is the individual troubled by their behavior,
or do they just find it just as normal as anyone else's sexual
orientation.

I look at whether the person -- the degree to which they understand
that they are victimizing people and they can draw the line between
their behavior and the fact that these children are being harmed
because of that.

And that -- I also look at, are there psychological factors that would
impact on the individual's re-offending. Certain personality types
might lead to an individual re-offending, other personality types and
psychological factors might reduce the risk of re-offending.

*Id*. at 54:10-55:25.

He concluded that, with a reasonable degree of medical certainty, E.L. did not meet the

criteria for a diagnosis of pedophilia and is not at risk of committing a sexual contact offense.

Continuing treatment would lower the already low risk of defendant re-engaging in the viewing of

child pornography. *See* Bardey Report at 16-18.

### c)    No Risk of Contact Offense

Dr. Bardey considered E.L.'s "risk of dangerousness to the community and his children."

*Id*. at 17. He explained that there were no signs that defendant's past viewing of child pornography

was a step towards a contact offense:

In [E.L.'s] case, in terms of both of those types of risk assessment, I
have found *no evidence that he was on his way toward a contact
offense. I saw no evidence that his behavior was anything but the
sort of obsessive collecting of a very narrow range of images.*

> After I wrote my report just recently, [I] viewed the contents of his hard drive, where [I] saw a number of images that were, in my opinion, of a very narrow range. Rather than a bell curve distribution of images of different ages and different sexual activities, this was an extremely restricted range of just prepubescent girls, naked, not involved in any sexual behavior with other children or adults. There was no bondage, there was no use of any kind of devices, there were no sexual interactions with adults.
>
> In my experience, having evaluated a number of different sex offenders, with child pornography, that's a much narrower range and much less virulent type of images that he was viewing. *I saw no evidence that he had been chatting with anyone, that he had been involved in any of the behaviors that I testified to earlier that would lead one to believe that he was or might be a risk of eventually committing a contact offense.*

Sent. Hr'g at 55:25-56:22 (emphasis added).

The doctor testified that E.L. "has no history of prior sexual offenses and no history of inappropriate behaviors towards children." Bardey Report at 16. While the psychosexual testing revealed a "chief interest" in females fourteen to seventeen years old, the expert noted that,

> [b]ut for his involvement with the instant offense, there is no evidence that [E.L.] has ever engaged in, or attempted to engage in, a direct contact offense towards a minor. There is no evidence that he was attempting to chat with [a] minor, manipulate minors, or try to meet with a minor. Instead, it appears that his ability to compartmentalize his interest in the material has remained intact, in that he has been able to fully contain the behavior to looking at a computer. There is no evidence that he chatted with other individuals about the material, or that he ever tried to meet a minor in any manner for any purpose. In other words, *there is no evidence of an actual interest in a contact sexual relationship with a minor.*

*Id*. at 16-17 (emphasis added). He concluded that, "with reasonable medical certainty," E.L. did not meet the relevant criteria for a diagnosis of pedophilia. *Id*. at 17. He also determined that, "[g]iven [E.L.'s] history, the result of this examination and the psychological testing results, it is my opinion with a reasonable degree of certainty that [E.L.] *is not a sexual predator and is not currently a risk to others in terms of committing a contact sexual offense*." *Id*. (emphasis added).

Dr. Bardey relied in part on defendant's path to viewing child pornography:

> [E.L.], at the time of the offense conduct, was suffering from depression, as this needy man felt abandoned by his wife and children. With no other outlets, no hobbies other than obsessive collecting, and no friends to spend time with, he turned to the Internet for company. He also used the Internet for sexual gratification, which eventually pi[qu]ed his Interest in adolescent, post-pubertal models. If there is any deviant interest to be ascribed to [E.L.], it is his interest in 14 to 18 year old females. This in itself, is not an abnormal finding among normal heterosexual men. In [E.L.'s] case his personality features, his anxiety and social awkwardness, have rendered adult women his age unapproachable. Other than his wife, even with whom he has sexual performance issues, [E.L.] likely feels much less anxiety using the Internet for sexual gratification, including images of late- adolescent women.

*Id*. This expert explained that the apparent "anonymity" and "safety" of the Internet allowed defendant to view child pornography, but that he would not otherwise be likely to have any contact with minors:

> [E.L.] is not, in my psychiatric opinion, at risk of committing a contact offense against a minor. To him, it would be both wrong and too anxiety provoking. *The anonymity, apparent safety, and distance provided by the Internet are factors that permitted his acting out.* Without such a medium, he would not be able to have any contact with that population. Thus, *if his risk of recidivism regarding the use of Internet child pornography can be mitigated, then [E.L.] presents little to no risk to the community*.

*Id*. at 18 (emphasis added).

He observed that defendant's many problems led him to viewing child pornography:

> [E.L.] is an unfortunate man who has suffered various developmental, medical, and psychological troubles in his life. Left with obsessive and avoidant personality traits, he turned to the Internet for social contact and sexual gratification during a period in his life where he was lonely, separated from his family, and depressed. *His interest in the material in question does not represent, in my opinion, a portal to a contact offense*.

*Id*. (emphasis added).

**d)** **Low Recidivism Risk with Treatment**

It was Dr. Bardey's conclusion that defendant's risk of committing a new child

pornography offense is "almost zero:"

> In terms of the risk of re-offending with child pornography, [E.L.]
> was deeply disturbed by his behavior. His underlying anxiety
> disorder has had a significant impact on his reaction to being
> arrested and prosecuted and being forced to deal with the
> consequences of this. And I think in that sense, that response is
> protective. I think he has insight in terms of how dangerous his
> behavior was, how harmful it was. And so based on that, my opinion
> is that *he is essentially almost zero risk of re-offending in terms of*
> *both the engaging in a contact offense and of re-offending*
> *specifically with child pornography*.

Sent. Hr'g at 56:23-57:8 (emphasis added).

He explained that E.L. is a "good candidate for treatment and rehabilitation." Bardey

Report at 18. Defendant is motivated to understand the criminal conduct at issue in the instant

case, and to engage in individual and group treatment. *Id*. The expert noted that defendant's

already low risk of re-offense would be further reduced through continued participation in

treatment:

> Terrified by his current charges, and credibly engaged in the process
> of uncovering the psychological underpinnings of the offense
> conduct, [E.L.] is a good candidate for treatment and rehabilitation.
> He is motivated to understand his offense conduct and to benefit
> from individual and group treatment modalities. As a result, I
> believe that his risk of re-offending is low, given the consequences
> of his behavior and its impact on his psyche. As stated, *his risk of*
> *re-offending, albeit small, would be further mitigated through*
> *continued participation in mental health treatment*.

*Id*. (emphasis added); *see also* Sent. Hr'g at 56:23-57:16.

According to Dr. Bardey, the treatment E.L. is actively participating in at QCFC would

further reduce any chance of him re-offending, particularly because he is cooperating:

> A.    . . . I was impressed by [E.L.'s] commitment to treatment.
>       And during the testimony of the prior witness, we heard

details about the type of treatment that he's undergoing, the nature of the groups, the topics discussed. We heard about his involvement, his commitment, his compliance, his level of participation. There was some talk of the kind of arc of *his response to the treatment, which taken all together, in my opinion, are helpful in reducing the risk of re-offending by improving his degree of insight* in terms of the underlying criminal behavior, in terms of developing tools and techniques to avoid situations that could put him at risk or put the community at risk. *So I was impressed with what I heard in terms of doing exactly what I mentioned in the report, which is intervention that would further mitigate the risk.*

Q.     So the treatment that [E.L. is] receiving at Queens Counseling For Change, is that the kind of treatment that you anticipated would result in a reduction of risk?

A.     Yes.

Sent. Hr'g at 110:4-22 (emphasis added); *see also id*. at 67:24-68:1 ("I think his risk is very small and I think . . . further treatment like what he's getting now even reduces that further."), 109:14-18 ("I think his active involvement in weeks and weeks of treatment, both individual treatment for his underlying psychological issues as well as the specific sex offender treatment, have only further mitigated the risk of recidivism in [E.L.].").

Particularly useful to the sentencing judge was Dr. Bardey's conclusion that an incarceratory sentence would disrupt defendant's family and his treatment progress, increasing the chance of recidivism:

Q.     And given your wide range of expertise, do you foresee any harm that could happen to [E.L.'s] treatment if he were incarcerated versus if he was continued in treatment? If there was a break in treatment through incarceration versus simply being allowed to continue with treatment?

A.     Well, I think if the eye is on the long-term in terms of helping [E.L.] completely understand what caused him to engage in this behavior and to prevent him from ever engaging [in] it again, I don't think incarceration would help with that. *I think it would actually be harmful in terms of the significant*

> *disruption it would cause to his family and to his children,*
> *which would then further isolate him socially, probably*
> *worsen his depression and anxiety, which could be then*
> *ultimately aggravating factors in raising the chance of*
> *recidivism.*

*Id.* at 58:15-59:3 (emphasis added).

### 2. Larry Menzie, LCSW

Larry Menzie, director of QCFC, also testified at defendant's sentencing hearing. Mr. Menzie holds a bachelor's degree in social work from Molloy College and a master's degree in social work from Columbia University. *See id.* at 6:5-7. He is on the executive board of the New York State Association for the Treatment of Sexual Abusers and is president of the New York State Alliance for Sex Offender Providers. *Id.* at 7:5-9. Mr. Menzie testified that his organization is "one of the largest [treatment] providers in the state," explaining that it "provide[s] treatment to about 90 percent of anyone in Queens County who has been either accused or adjudicated for a sex offense, whether they are on parole, probation, court supervision, family court supervision, or dealing with the foster care system." *Id.* at 6:22-7:2.

Defendant attends weekly group therapy sessions at QCFC run by a licensed clinical social worker with some twenty-five years of social work experience and long familiarity with the treatment of sex offenders. *See id.* at 7:19-23. Mr. Menzie holds weekly meetings with E.L.'s treating therapist and also occasionally meets with E.L. on an individual basis. *See id.* at 11:13-20.

According to Mr. Menzie's testimony, the goal of treatment "is to change the behavior, have clients understand their behavior, create safety plans, and help them to engage in their safety plans." *See id.* at 8:2-4. Treatment normally lasts about two years. *Id.* at 8:7-8.

At the time of sentencing, defendant had attended about 40 sessions out of the 104 needed to complete the program. *See id.* at 7:16-17, 13:2-4. The QCFC Report notes defendant's continued active positive participation:

> [E.L.] presents as highly motivated towards treatment, less verbally impulsive and responds well to re-direction. He appears to understand material, appropriately brings questions or concerns to visits for counsel and feedback, reports using material in daily life, and reports having increased awareness of the effects of his actions on others. *Client continues to focus on treatment goals* related to: thinking patterns, increasing impulse control and judgment under stress, identifying high risk situations, and insight into actions. *Client is assuming financial responsibility and is attending as scheduled.*

QCFC Report (emphasis added).

According to Mr. Menzie, defendant has continued to improve throughout the course of therapy. *See* Sent. Hr'g at 15:6-8 ("We continued to see improvement. We have not really experienced a period with [E.L.] where we have seen a slide back.").

### B. Social Worker

Vivianne Guevara, the Director of Client and Mitigation Services at the Federal Defenders of New York, Eastern Division, carried out an assessment of E.L.'s family. It consisted of "visiting with the family, interviewing different family members, and generally observing the family interact." *Id.* at 112:6-8. Ms. Guevara holds a master's degree in social work from Columbia University. *Id.* at 111:24-112:1. She submitted a report and testified at the sentencing hearing. *See* Vivianne Guevara Family Assessment, Mar. 22, 2016, ECF No. 37-1 ("Guevara Report"); Sent. Hr'g at 111:13-121:25.

Ms. Guevara conducted two home visits with E.L. and his family in Stroudsburg, Pennsylvania. She first met with the entire family for a two-and-a-half-hour session, and then, two days later, met with the family without defendant for four hours. *See* Guevara Report at 1. She

observed the children interact with and without their father, as well as engage with other family members and in outside activities such as soccer and community events. *See* Sent. Hr'g at 112:22-113:10. Ms. Guevara described the importance of observing the children in family interactions in order "to see if there's a difference or what kind of behaviors they display when interacting with other people." *Id*. at 113:18-19.

She reported observing a loving and close-knit family. *See id*. at 113:25-114:13. E.L. is the sole financial provider. Guevara Report at 1-2. His wife focuses on raising the couple's two nine year old boys and running the household. *Id*. Ms. Guevara observed a close relationship between defendant and his children, who rely heavily on their father for physical and emotional support:

> [E.L.] is a very supportive father and connects with his children on an emotional level. The children rely on their father for social support and guidance in their path from boyhood to manhood. . . . [E.L.'s] children are affectionate towards their father and their obvious bond is expressed through respectful conversations and a willingness to share positive experiences and joyful memories. [E.L.] contributes financially to the family but also provides parental guidance; *he is a role model to his sons, his contributions to his sons' wellbeing and upbringing are immeasurable.*

*Id*. at 3 (emphasis added); *see also* Sent. Hr'g at 117:14-16 ("[E.L.] is definitely the father figure in the family. The boys look to him for that guidance and support. It was evident when I was there, that he is integral in this family."). She testified that nothing she observed raised concerns about the relationship between E.L. and his children:

> Q.  In your observations, was there anything that you observed that gave you pause or concern about the relationship between [E.L.] and his children?
>
> A.  No. *There was no cause for concern for the relationship.* He has a very loving relationship with his boys. They treat him with respect, they speak to him in a very playful but also respectful manner, and the interaction seems very appropriate and the attachment very appropriate.

Sent. Hr'g at 120:11-18 (emphasis added).

Ms. Guevara concluded that the family would be seriously adversely impacted if defendant were to be sentenced to a term of incarceration:

> [E.L.'s] financial and parental contributions to the . . . household are vital to this family's survival; the family literally depends on [E.L.] for the basic needs of shelter, food, and clothing. [E.L.'s] social and emotional contributions as a father are expected by his two sons and their absence would negatively impact the children's emotional, social, and cognitive development. It is evident [E.L.'s] strong family structure is a protective factor that has helped him remain free of incidents while on pretrial release, and that will ensure his compliance with any future requirements of supervision. . . . *The most beneficial outcome . . . will be to keep the family together.*

Guevara Report at 5 (emphasis added); *see also* Sent. Hr'g at 119:11-15 ("I definitely think that *incarceration would fragment this family*, primarily financially, at first, but then the boys would just -- I mean, I don't foresee anything positive happening from it. *I think they would suffer immensely.*") (emphasis added).

## C. Wife

E.L.'s wife testified at his sentencing hearing. She spoke of the loving relationship that unites them and their children, and the heavy financial and emotional burden that a prison term would place on their family. *See* Sent. Hr'g at 122:12-129:14.

## IV. Sentence Imposed

Defendant was sentenced on March 23, 2016. Before sentencing, he affirmed his guilty plea. *Id*. at 135:18-136:12.

The total offense level under the United States Sentencing Guidelines ("Guidelines") is 24, with the lowest possible criminal history category of I. PSR at ¶¶ 15-33, 64. This yields a sentencing range of 51 to 63 months of imprisonment. *Id*. at ¶ 64. The parties did not contest these calculations. *See* Sent. Hr'g at 138:11-23. Following a detailed analysis of defendant and

the instant offense, the Probation Department recommended five years of probation with no incarceration. *See* U.S. Probation Department Sentencing Recommendation, Feb. 9, 2016 (sealed).

Defendant was sentenced to five years of probation. Conditions of supervision were outlined in detail in Court Exhibit 9 at the sentencing hearing. *See* Sent. Hr'g at 155:19-158:11; Ct. Ex. 9 (Excerpt from U.S. Probation Department Sentencing Recommendation). They include: obligations regarding the disclosure of financial records; sex offender registration; participation in mental health treatment programs; polygraph examinations; limitations on use of the Internet and other electronic devices; monitoring of defendant's Internet activities; prohibition on the possession of firearms; agreement to submit to searches of home and property by a Probation officer and to respond positively to Probation's orders. *See* Sent. Hr'g at 155:19-158:1.

Defendant is prohibited from associating with any children under eighteen unless a responsible adult is present; this requirement does not apply to his own children. *Id*. at 156:21-157:6. He is currently employed as a computer programmer; he is allowed to use a computer for business purposes. *See id*. at 156:6-20. No restrictions are imposed on defendant traveling from Brooklyn, where he works, to and from Pennsylvania, where his wife and children reside. *See id*. at 155:19-158:11. This is a non-Guidelines sentence.

Since defendant lacked sufficient assets to pay a fine, none was levied. *See id.* at 140:13-15. A $100 special assessment was imposed. *Id*. at 140:23-24. Forfeiture of defendant's external hard drive and laptop was ordered. *See* Order of Forfeiture, Mar. 23, 2016, ECF No. 41.

One victim was identified for purposes of restitution. *See* Sent. Hr'g at 149:1-4. At the time of sentencing, the government was attempting to collect further information from the victim. *See id*. at 131:8-14. The parties agreed to stipulate to a restitution amount and submit the stipulation within 90 days of the sentencing hearing. *See id*. at 131:18-132:6.

## V.     Sentencing Law

### A.     Discretion of Sentencing Judge

A high degree of discretion is possessed by the sentencing judge when determining appropriate punishment.  *See, e.g.*, *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc) ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime.").  It is the sentencing court that "is in the best position to judge the appropriateness of a sentencing departure in light of the defendant's overall history and character, his remorse or lack of it, and other factors bearing on the sentence to be imposed."  *United States v. Crowley*, 318 F.3d 401, 421 (2d Cir. 2003); *see also D.M.*, 942 F. Supp. 2d at 341.

### B.     Applicable Statute

Defendant pled guilty to possession of child pornography acquired through a computer. The statute reads:

> Any person who . . . knowingly possesses, or knowingly accesses with intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce . . . by any means including by computer, if – (i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and (ii) such visual depiction is of such conduct; shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 2252(a)(4)(B).

No statutory mandatory minimum term of imprisonment is applicable.  *See* 18 U.S.C. § 2252(b)(2).  The maximum prison term is ten years.  *Id.*; PSR at ¶ 63.  Defendant is subject to a minimum term of supervised release of five years.  18 U.S.C. § 3583(k); PSR at ¶ 65.

In the absence of a statutory mandatory minimum sentence, a district court must consider a variety of traditional factors when determining the appropriate punishment.  Justice Stevens in

dissent summarized these considerations: "before guideline sentencing became so prevalent[,] . . . sentencing judges wisely employed a proportionality principle that took into account all of the justifications for punishment—namely, deterrence, incapacitation, retribution, and rehabilitation." *Ewing v. California*, 538 U.S. 11, 34-35 (2003).

## C.    Advisory Nature of the Sentencing Guidelines

A district court must determine the applicable sentencing range pursuant to the Guidelines. *See Dorvee*, 616 F.3d at 180 (citing *Gall*, 552 U.S. at 49).  Nonetheless, in *United States v. Booker*, the Supreme Court determined that the Guidelines are advisory only.  *Booker*, 543 U.S. at 245, 264.  Although no longer mandatory, the Guidelines' sentencing ranges continue to function as "the starting point and the initial benchmark" for sentencing proceedings.  *Gall*, 552 U.S. at 46, 49 (noting that the Guidelines are presumed to be "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). The Guidelines must be given "respectful consideration" by the sentencing court.  *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal citations omitted).

### 1.    Section 3553(a) Factors

After consulting the Guidelines, a sentencing court performs an "individualized assessment" of the situation.  *Gall*, 552 U.S. at 50.  This analysis is guided by "[r]easonableness" and an "individualized application of the statutory sentencing factors" listed in section 3553(a) of the United States Code, title 18.  *See Dorvee*, 616 F.3d at 184 (citing *Gall*, 552 U.S. at 46-47); *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring) ("[T]he district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines.").  These are as follows:

> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;

(2) the need for the sentence imposed--

    (A) to reflect the seriousness of the offense, to promote respect for the law; and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [by the Guidelines;]

(5) any pertinent policy statements [issued by the Sentencing Commission;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Pursuant to the "parsimony clause" in section 3553(a), a court should "impose a sentence sufficient, but not greater than necessary." 18 U.S.C. § 3553(a); *see also Dorvee*, 616 F.3d at 182 (internal citations omitted). In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, their families, society and our economy, frugality in incarceration is prized. *See, e.g.*, Nat'l Res. Council of the Nat'l Academies, *The Growth of Incarceration in the United States, Exploring Causes and Consequences*, 8 (2014) ("*Parsimony*: the period of confinement should be sufficient but not greater than necessary to achieve the goals of sentencing policy.").

## 2. Departures Based on Disagreement with Commission Policy

A sentencing court need not follow the sentencing range suggested by the Guidelines if it disagrees with the policy it reflects. *See, e.g.*, *Spears v. United States*, 555 U.S. 261, 264 (2009) (stating that "the point of *Kimbrough*" was to "recogni[ze] [the] district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case") (emphasis in original).

The Guidelines for child pornography offenses were not supported by a Commission study; they were amended at the direction of Congress. *See Dorvee*, 616 F.3d at 184-86; *see also United States v. Diaz*, No. 11-CR-821, 2013 WL 322243, at *3 (E.D.N.Y. Jan. 28, 2013) (providing that the authority for a non-Guidelines sentence "is at its greatest when the offense Guideline at issue is not the product of the Commission's empirical analysis and technical expertise"). The Commission has sought—but has not been granted—authority from Congress to amend the current child pornography provisions to make them more appropriate. *See* U.S. Sentencing Comm'n, *Federal Child Pornography Offenses* (Dec. 2012), at 322 ("[T]he Commission believes that Congress should enact legislation providing the Commission with express authority to amend the current guideline provisions that were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines."); *see also Dorvee*, 616 F.3d at 185 (detailing the Commission's opposition to Congressionally mandated changes).

## 3. Statement of Reasons Required

A sentencing court shall "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). If the sentence is not of the kind prescribed by, or is outside the range of, the Guidelines referred to in section 3553(a)(4), the court shall indicate the specific

reasons for imposing a sentence different from the Guidelines. 18 U.S.C. § 3553(c)(2). These "reasons must also be stated with specificity in a statement of reasons form." *Id.* Even though, pursuant to *Booker*, the Guidelines are no longer mandatory, the sentencing court must still adhere to the requirements of section 3553(c)(2). *United States v. Jones*, 460 F.3d 191, 196-97 (2d Cir. 2006).

The sentencing court's written statement of reasons shall be "a simple, fact-specific statement explaining why the Guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Rattoballi*, 452 F.3d 127, 138 (2d Cir. 2006), *abrogated in part on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007). A statement should demonstrate that the court "considered the parties' arguments and that it has a reasoned basis for exercising its own legal decisionmaking authority." *Cavera*, 550 F.3d at 193 (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)) (internal alterations and quotation marks omitted).

### D.     Restitution

Pursuant to section 2259 of title 18, victims of certain child exploitation offenses, including possession of child pornography, are entitled to mandatory restitution. The order of restitution "shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses." 18 U.S.C. § 2259(b)(1). This includes:

> [A]ny costs incurred by the victim for: (A) medical services relating to physical, psychiatric, or psychological care; (B) physical and occupational therapy or rehabilitation; (C) necessary transportation, temporary housing, and child care expenses; (D) lost income; (E) attorney's fees, as well as other costs incurred; and (F) any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(3).

In *Paroline v. United States*, the Supreme Court outlined how to determine the proper amount of restitution that "a possessor of child pornography must pay to the victim whose

childhood abuse appears in the pornographic materials possessed." *Paroline v. United States*, 134 S. Ct. 1710, 1716 (2014). The Court held that "[r]estitution is . . . proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 1722. In a case in which a defendant possesses images of a victim and the

> victim has outstanding losses caused by the continuing traffic in
> those images but where it is impossible to trace a particular amount
> of those losses to the individual defendant[,] . . . a court applying §
> 2259 should order restitution *in an amount that comports with the
> defendant's relative role in the causal process that underlies the
> victim's general losses*.

*Id*. at 1727 (emphasis added).

The *Paroline* defendant possessed two images of the victim seeking restitution; he was one of potentially thousands of people possessing her images. Although any award should not be "a token or nominal amount," the Court declared that in such instances restitution "would not be severe . . . given the *nature of the causal connection between the conduct of a possessor like Paroline and the entirety of the victim's general losses from the trade in her images, which are the product of the acts of thousands of offenders*." *Id*. (emphasis added).

In directing how a restitution award should be calculated, the Court concluded that "[t]his cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment." *Id*. at 1728. A court should "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." *Id*. at 1727-28. As a starting point, district courts should "determine the amount of the victim's losses caused by the continuing traffic in the victim's images," and "then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses." *Id*. at 1728. District courts could take into consideration a variety of factors, including:

> [T]he number of past criminal defendants found to have contributed
> to the victim's general losses; reasonable predictions of the number
> of future offenders likely to be caught and convicted for crimes
> contributing to the victim's general losses; any available and
> reasonably reliable estimate of the broader number of offenders
> involved (most of whom will, of course, never be caught or
> convicted); whether the defendant reproduced or distributed images
> of the victim; whether the defendant had any connection to the initial
> production of the images; how many images of the victim the
> defendant possessed; and other facts relevant to the defendant's
> causal role.

*Id*.

The Court cautioned that "[t]hese factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders." *Id*. Rather, the factors are to serve as "rough guideposts for determining an amount that fits the offense." *Id*.

## VI. Application of Law to Facts

### A. Guidelines Sentencing Range

The applicable Guidelines offense level is 24, with no criminal history. This yields a sentencing range of 51 to 63 months in prison. The offense level was calculated as follows:

- Base offense level of 18 pursuant to U.S.S.G. § 2G2.2;

- Two-level enhancement because the material involved a prepubescent minor or a minor who had not attained the age of 12 years old, pursuant to U.S.S.G. § 2G2.2(b)(2);

- Two-level enhancement because the offense involved the use of a computer, pursuant to U.S.S.G. § 2G2.2(b)(6);

- Five-level enhancement because the offense involved at least 600 images, pursuant to U.S.S.G. § 2G2.2(b)(7)(D);

- Two-level reduction because defendant clearly demonstrated acceptance of responsibility for the offense, pursuant to U.S.S.G. § 3E1.1(a);

- One-level reduction because the government was informed in a timely manner of defendant's intention to plead guilty, pursuant to U.S.S.G. § 3E1.1(b).

PSR at ¶¶ 14-33. The parties did not object to this calculation. *See* Sent. Hr'g at 138:11-13.

**B. Analysis of Section 3553(a) Factors**

A sentencing court is required to carry out an individualized assessment in order to reach a sentence that is "sufficient, but not greater than necessary, to comply" with the requirements of section 3553(a). *See* 18 U.S.C. § 3553(a).

### 1. Circumstances of Offense; Characteristics of Defendant

The individual circumstances of the case were analyzed, including the nature of the offense and the history and characteristics of the defendant. A non-incarceratory sentence is appropriate.

The offense conduct is the possession of child pornography. After turning to online pornography during a period of depression and loneliness caused by, among other factors, separation from family, unemployment, and feelings of abandonment and rejection, defendant collected images of underage girls posing naked—engaging in what is known as "lascivious display." *See, e.g.*, Sent. Hr'g at 145:24-146:2. The images did not depict sexual acts or violence; there was no bondage, and no objects were used. The images downloaded by defendant fall into a narrow range, suggesting that his behavior bears a closer link to his obsessive compulsive disorder than to any pedophilic tendencies. *See id.* at 56:2-22 (Dr. Bardey); *see also supra* Part III.A.1.

There is no evidence of defendant ever trying to touch a child, or talking with a minor or with other individuals interested in child pornography. *See, e.g.*, Bardey Report at 16-18; Sent. Hr'g at 145:24-146:2 (defendant's counsel explaining that "[t]his is a serious offense, but, again, this is a very atypical offense where there is simply photographs of lascivious display, no videos, no endorsement of chat rooms, no child contact in any way shape or form . . . .").

Defendant has been battling for a large part of his life with severe anxiety, depression, and OCD. He was born with a number of physical disabilities that continue to adversely affect him. His parents were alcoholics and his mother was abusive. Despite these handicaps, defendant was

able to pursue higher education, build a family, and provide for his wife and children.  His wife

and Ms. Guevara, the investigating social worker, testified to the significant support E.L. provides

to his family—from being the sole financial provider, to offering guidance to his boys as they grow

up.  An incarceratory sentence would severely disrupt a wholesome family.

E.L. is deeply remorseful for his actions.  In a letter to the court, which he read at sentencing,

he stated that he understands what he did was wrong.  He asked to be allowed to continue

treatment:

> I want my children to remember me as a loving and caring parent to
> them.  Besides my wife and children, my in-laws also rely on me to
> help them understand how to live inside the United States because
> they do not read or write English.  Currently, my wife and I are very
> active in seeking treatment for my father-in-law's bladder cancer.
>
> I do not pretend.  I know that I did wrong things to calm my anxious
> moods, depression and loneliness in the past.  I have never been in
> trouble in my life before this arrest.  I never physically hurt any adult
> or child in my life.  I always voted and pay my taxes on time.  *I
> would like you to please give me a chance to continue my
> psychotherapy treatment in Queens Center for Change so I can keep
> my current job and learn to become a better man, father, and
> husband.*

*Id*. at 150:24-151:12 (emphasis added).

Since his arrest, E.L. has been actively engaged in both individual and group therapy,

including treatment designed specifically for sex offenders.  Mr. Menzie testified to E.L.'s

engagement and progress.  *See supra* Part III.A.2.  Ms. Voskoboynik, E.L.'s treating

psychotherapist, stated that

> [h]e has been making a very good progress during the cognitive-
> behavioral . . . sessions over the last few months.  Overall, he has
> made some progress in improving his newly coping mechanisms
> and stress reduction techniques of dealing with his emotional
> condition.  *He needs to continue treatment to make sure that his
> overall functioning and emotional condition will remain stable.*

Voskoboynik Letter (emphasis added).

Dr. Bardey agreed that allowing defendant to continue his current treatment would be beneficial to him and his family, and would lower any already low risk of re-offense. *See* Bardey Report at 18; Sent. Hr'g at 56:23-57:16; *see also supra* Part III.A.1.d.

A sentence of probation with strict conditions of supervision will allow defendant to continue his treatment and provide the necessary financial, social and emotional support to his family.

## 2. Purposes of Sentencing

Pursuant to section 3553(a)(2) of the United States Code, title 18, any sentence imposed must: reflect the seriousness of the offense; promote respect for the law; provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2); *see also D.M.*, 942 F. Supp. 2d at 345-46. The likelihood that defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing [a] sentence." *Pepper v. United States*, 562 U.S. 476, 492 (2011); 18 U.S.C. § 3553(a)(2)(C).

The downloading and viewing of images in which children were compelled to pose naked is a serious offense and one that perpetuates the harm inflicted upon the minors. *See, e.g.*, *R.V.*, 2016 WL 270257, at *38 ("Possession of child pornography may contribute to the existence of a market that harms and exploits children. The serious injury children are exposed to does not end with the making of child pornography; instead, it is perpetuated by the continued distribution and consumption of those images."); *D.M.*, 942 F. Supp. 2d at 344 ("Continued emotional violence is visited upon the victims of child pornography by the knowledge that their abuse is being viewed and consumed by individuals like defendant.").

Not all child pornography offenders possess the same degree of culpability or pose a danger to the community. *See R.V.*, 2016 WL 270257, at Part I.A. Sentencing must "balance the need to

protect the public, and juveniles in particular, against the need to avoid excessive punishment, with resulting unnecessary cost to defendants' families and the community, and the needless destruction of defendants' lives." *See id*. at *1.

The perceived anonymity of the Internet, together with the vast amount of illicit images readily available online, have drastically "expand[ed] the category of people arrested for possession and distribution offenses involving explicit sexual images of minors obtained through home computers using various peer-to-peer file sharing programs." *Id*. at *2.

In this instance, the defendant displayed a low degree of culpability. *See id*. at Part I.A. He is guilty of possessing images and thereby indirectly contributing to a market which perpetuates the harm caused to minors. He never had a *mens rea* threatening actual contact with a child and, according to credible medical and expert testimony, he is unlikely to ever pursue a contact offense. *See supra* Part III.A.

While correction is warranted, general and specific deterrence are achieved by a non-incarceratory sentence. Defendant will have to live with the serious collateral consequences of his conviction: he will perpetually bear the scarlet letter that comes with being a convicted felon and registered sex offender. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) (recognizing that the "stigma" imposed for a violation of a sex crime statute "is not trivial"); Model Penal Code: Sexual Assault and Related Offenses, General Commentary at 12 (Am. Law. Inst., Discussion Draft No. 2, 2015) ("*[T]he treatment of sex offenders has borne many of the hallmarks of an unjustifiably punitive state*. For instance, sex offenders as a class have been subjected to some of the most unforgiving and indiscriminate collateral consequences of conviction, such as unduly severe residency restrictions or registration requirements.") (emphasis added).

Defendant will have to comply with strict supervision requirements, including the monitoring of his computer and polygraph testing, which are likely to adversely impact his employment as well as his family and social life. *See supra* Part IV; 42 U.S.C. § 16913 (federal sex offender registration and notification requirements); 18 U.S.C. § 3583(k) (supervised release term for federal sex offenders); *see also* N.Y. Correct. Law § 168 *et seq.* (New York State's sex offender registration act may also apply to federal child pornography offenders residing in New York pursuant to § 168–a (2)(d)(iii)); *cf. Nichols v. United States*, 136 S. Ct. 1113, 1119 (2016) (noting that the requirements of the Sex Offender Notification Act ("SORNA") remain strong and that "Congress has recently criminalized the 'knowin[g] fail[ure] to provide information required by [SORNA] relating to intended travel in foreign commerce'"); *United States v. Parisi*, No. 15-963, -- F.3d --, 2016 WL 1743052 (2d Cir. May 3, 2016) (finding that modification of special conditions of supervised release to include what are now standard conditions of supervision for individuals convicted of sex offenses—*i.e.*, submission to searches as well as polygraph and computerized voice stress analyzer examination—was not improper).

The heavy burdens of sex offender registration requirements are well-known. *See, e.g.*, *R.V.*, 2016 WL 270257, at *32 ("Reconnecting with family and loved ones may be particularly hard for convicted sex offenders, because of the stigma associated with the offense as well as the strict restrictions imposed upon release."); Letter from H.F. and R.F., Feb. 3, 2011, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 315-2 (the parents of a young man incarcerated for downloading child pornography stated that "[a]s permanent felons and permanently registered sex offenders with residency and employment restrictions, they fear imposing additional burdens, shame, and subsequent trauma on their wives and children by living under the same roof. This extinguishes any possible pathway to repairing these marriages and

families."); Letter from R.G.R., Oct. 1, 2013, filed in *United States v. Polouizzi*, No. 6-CR-22, ECF No. 360-1 (a mother of a young man convicted of possession of child pornography wrote that her son "struggles day-to-day to find work, housing, to maintain his sense of self-worth, his dignity, to find some hope for the future for himself and his lovely new bride. He is held back enormously because he is on the public registry.").

A mother recently submitted a letter to this court detailing the continued burdens faced by someone registered as a sex offender:

> My son, who is now almost 49 years old, served three years, reduced from 10, in Federal prison for viewing child porn on the internet. No chats, no contact of any kind; strictly viewing. No previous record. Upstanding, tax paying, hard working, loving father of two, whose marriage was on the rocks. . . . [M]y son was getting psychiatric help the year up to his sentencing and his psychiatrist deemed him not to be a danger to his children or any other children and not likely to relapse into viewing.

> [My son] has been out of prison for about eight years now. He lost his wife, they divorced while he was in prison, his house, and the ability to keep a job. He manages to get hired because of charm, intelligence and an impressive resume from before prison years. The restrictions placed on him by being on the sex offender registry are draconian. He discloses that he has a record up front. A few months later, when they go to promote him, they look further into his record. When they see the words "sex offender" they show him the door. After this happened on three different occasions my husband and I decided to buy a small business that [he] would manage. This way he would have a salary and move out of our house into his own rented place (squalid though it may be because of restrictions placed on him) like a "mench." We took out a loan to do this. We are retired. The business is now three years old and it has been a struggle. I feel like I am supporting[] the business, my son, my grandchildren and the Federal government (business taxes). . . . [He] did what he did and did time for it. He should not be punished forever, nor should we. This can't go on forever. My fear is that the business is about to fail and [he] will be back to square one, looking for work. The good news is his children are now in college. They are wonderful. It has not been easy for them.

In 2019 he has the right to appeal to have his name removed from the registry. If only it could happen now, he would be able to support his family. We look forward to 2019. . . .

The sex registry is not a good thing in all cases. People like [my son], people who were loved and respected in their communities, loved by their temples or churches and who do not pose a danger should be able to earn a living whether they have done time or not. Our hope now is that his name be removed from the registry. In the meantime we are all doing the best we can.

Letter from N.J.S., undated, filed in *United States v. R.V.*, 14-CR-316, ECF No. 69.

A prison sentence in the instant case is not necessary to protect the public. E.L. has been actively involved in effective treatment. Mr. Menzie testified that defendant has made considerable progress since he started group therapy sessions at QCFC. According to Dr. Bardey, defendant does not meet the criteria for pedophilia. Bardey Report at 17. He is "not a sexual predator and is not currently a risk to others in terms of committing a contact sexual offense." *Id*. This expert also testified that defendant's risk of committing a new child pornography offense is "almost zero" and that any recidivism risk is further mitigated by defendant's participation in his current treatment program. *See e.g.*, Sent. Hr'g at 56:23-57:8, 57:9-25, 109:14-18, 67:24-68:1 ("I think his risk is very small and I think . . . further treatment like what he's getting now even reduces that further.").

A sentence of probation will allow defendant to continue engaging in treatment, further decreasing his chance of re-offending. *See id*. at 58:23-59:3 (Dr. Bardey testified that, in his opinion, incarceration "would actually be harmful in terms of the significant disruption it would cause to [defendant's] family and to his children, which would then further isolate him socially, probably worsen his depression and anxiety, which could be then ultimately aggravating factors in raising the chance of recidivism.").

### 3. Kinds of Sentences Available

Sentences actually imposed in similar cases have been considered, as required by section 3553(a)(3)-(4). The sentencing options available to the court include combinations of the following variables: custody followed by supervised release; probation; restitution; forfeiture; and fines. Of critical importance is the availability of effective sex offender treatment outside of prison.

In the instant case, the sentences available were as follows: an incarceratory sentence of between 51 and 63 months pursuant to the Guidelines; a term of supervised release of five years to life; not less than one nor more than five years' probation; criminal forfeiture; a maximum fine of $250,000; restitution; and a mandatory special assessment of $100. *See* PSR at Part D. The court considered all available options. A sentence of five years of probation under strict conditions of supervision and with sex offender treatment, coupled with the continuing sex offender notification and registration requirements as provided by statute under section 16913 of title 42, amounts to appropriate punishment and control.

### 4. Guidelines, Policy, and Other Criteria of Sentencing Commission

The United States Sentencing Commission has voiced its own concerns with respect to the current Guidelines' ability to reflect varying degrees of culpability given the impact of recent technological changes on the offense of child pornography. As explained by the Court of Appeals for the Second Circuit in *Dorvee*, section 2G2.2 is "a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Dorvee*, 616 F.3d at 184.

While the Guidelines are generally developed by the Commission through empirical studies focused on data about past sentencing practices, this was not the case for child pornography offenses. The Guidelines were amended at the direction of Congress. The Commission apparently

opposed the harsher penalties imposed by the legislature. *See id*. at 184-86; *see also* U.S. Sentencing Comm'n, *The History of the Child Pornography Guidelines* (Oct. 2009).

In 2012, the Commission completed a multi-year examination of "offenders sentenced under the federal sentencing guidelines and corresponding penal statutes concerning child pornography offenses." U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at i. It was especially concerned with the Guidelines applicable to non-production child pornography crimes and the extent to which they meaningfully distinguished among different offenders' levels of culpability. Observed was that, "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id*. at ii; *see also R.V.*, 2016 WL 270257, at *41.

While noting that "[a]ll child pornography offenses are extremely serious because they both perpetuate harm to victims and normalize and validate the sexual exploitation of children," the Commission concluded that "revisions are needed to more fully differentiate among offenders based on their culpability and sexual dangerousness." U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at 311.

Recommended by the Commission was that "the non-production child pornography sentencing scheme should be revised to account for recent technological changes in offense conduct and emerging social science research about offenders' behaviors and histories, and also to better promote the purposes of punishment by accounting for the variations in offenders' culpability and sexual dangerousness." *Id*. at xvii.

A below-Guidelines sentence for a first time non-production offender which takes into account the absence of risk posed by defendant as well as his individual level of culpability and his family's needs is consistent with concerns expressed by the Sentencing Commission.

### 5. Unwarranted Sentence Disparities

Section 3553(a)(6) of title 18 requires an analysis of comparable sentences. While courts have sometimes imposed sentences within and above the applicable Guideline ranges in child pornography cases, disagreement with the current sentencing scheme has convinced an increasing number of judges to impose sentences below those recommended by the Guidelines, particularly in non-production cases. *See, e.g.*, *D.M.*, 942 F. Supp. 2d at 347-48 ("While it is not difficult to find cases where severe sentences within and above the Guidelines have been imposed, there is by no means a paucity of cases where judges downwardly depart from the Guidelines. The unreasonable harshness of the Guidelines for an offense of child pornography possession, of which defendant is charged, has been recognized by courts and judges from across the country."); *see also R.V.*, 2016 WL 270257, at *42-43 (noting that an increasing number of federal judges consider the Guidelines for child pornography possession and receipt to be too severe); U.S. Sentencing Comm'n, *Federal Child Pornography Offenses*, at xii ("A variety of stakeholders in the federal criminal justice system . . . believe that [the current non-production penalty scheme] fails to adequately differentiate among offenders based on their culpability and sexual dangerousness, needs to be updated to reflect recent changes in typical offense conduct associated with the evolution of computer and Internet technologies, and is too severe for some offenders.").

Courts have noted the comparatively lower culpability of defendants convicted of possessing child pornography (as opposed to distribution, production and physical abuse). With respect to defendants convicted only of possession offenses, courts have increasingly imposed sentences with minimal or no incarceration. *See, e.g.*, *R.V.*, 2016 WL 270257, at *44 (imposing a

sentence of time served and seven years of supervised release); *D.M.*, 942 F. Supp. 2d at 352 (sentencing defendant to five years of probation for possession of child pornography); *United States v. Autery*, 555 F.3d 864, 867 (9th Cir. 2009) (affirming non-Guidelines sentence of five years of probation for possession of child pornography); *United States v. Stall*, 581 F.3d 276, 277-78 (6th Cir. 2009) (affirming non-Guidelines sentence of one day of incarceration followed by ten-year period of supervised release for defendant convicted of two counts of possession of child pornography); *United States v. Prisel*, 316 F. App'x 377, 378 (6th Cir. 2008) (affirming non-Guidelines sentence of one day in prison followed by eighteen months of home confinement for possession of child pornography); *United States v. Rowan*, 530 F.3d 379, 380 (5th Cir. 2008) (affirming non-Guidelines sentence of five years of probation and no period of incarceration for possession of child pornography); *United States v. Polito*, 215 F. App'x 354, 355 (5th Cir. 2007) (per curiam) (affirming non-Guidelines sentence of five years of probation with one year of house arrest for possession of child pornography); *United States v. Crespo-Rios*, No. 08-CR-208, 2015 WL 6394256, at *1 (D.P.R. Oct. 19, 2015) ("[R]esentencing Defendant to the same sentence—that is, time served followed by a long period of supervised release—is justified in view of each of the sentencing factors outlined in 18 U.S.C. § 3553."); *United States v. Mallatt*, No. 13-CR-3005, 2013 WL 6196946, at *13 (D. Neb. Nov. 27, 2013) (finding that, for defendant convicted of one count of possession of child pornography, "sentence of time served, followed by six years of supervision with special conditions including intensive treatment is adequate to fulfill the goals of sentencing . . ."); *United States v. Evren*, No. 10-CR-131 (E.D.N.Y. Feb. 26, 2013) (ECF No. 59) (imposing non-Guidelines sentence of three years of probation for defendant who pleaded guilty to one count of possession of child pornography); *United States v. Diaz*, 720 F. Supp. 2d 1039, 1048 (E.D. Wis. 2010) (imposing non-Guidelines sentence of six months of incarceration followed

by twelve years' supervised release); *United States v. Meillier*, 650 F. Supp. 2d 887, 887 (D. Minn. 2009) (imposing non-Guidelines sentence of one day of confinement followed by thirty years of supervised release on defendant convicted of possession of child pornography); *United States v. Boyden*, No. 06-CR-20243, 2007 WL 1725402, at *10 (E.D. Mich. June 14, 2007) (imposing non-Guidelines sentence of one day of confinement followed by three years of supervised release, the first year of which to be served in a community correctional facility).

### C. Policy Considerations

In addition to the Sentencing Commission, several other stakeholders, including the Department of Justice and sentencing judges across the country, have voiced their concerns with the current child pornography Guidelines.

The United States Department of Justice has requested the Sentencing Commission to revise the Guidelines, writing: "the evolution of the child pornography 'market' ha[s] led to a significantly changed landscape—one that is no longer adequately represented by the existing sentencing guidelines." Letter from Anne Gannon, Nat'l Coordinator for Child Exploitation & Interdiction, to Judge Patti B. Saris 1 (Mar. 5, 2013).

Criticized have been changes to sentencing laws that have effectively quadrupled defendants' average prison term over the last decade. *See, e.g.*, *United States v. Grober*, 624 F.3d 592, 603-04 (3d Cir. 2010). In *Dorvee*, the Second Circuit Court of Appeals explained:

> The § 2G2.2 sentencing enhancements cobbled together through this process routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases. The base offense level for distribution of child pornography, which in 1991 was 13, has been gradually increased to 22 as the Commission has attempted to square the Guidelines with Congress's various directives. On top of that, many of the § 2G2.2 enhancements apply in nearly all cases. Of all sentences under § 2G2.2 in 2009, 94.8% involved an image of a prepubescent minor (qualifying for a two-level increase pursuant to § 2G2.2(b)(2)), 97.2% involved a computer (qualifying for a two-level increase pursuant to §

2G2.2(b)(6)), 73.4% involved an image depicting sadistic or masochistic conduct or other forms of violence (qualifying for a four-level enhancement pursuant to § 2G2.2(b)(4)), and 63.1% involved 600 or more images (qualifying for a five-level enhancement pursuant to § 2G2.2(b)(7)(D)). In sum, these enhancements, which apply to the vast majority of defendants sentenced under § 2G2.2, add up to 13 levels, resulting in a typical total offense level of 35.

An ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to 210 months, rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction. Consequently, adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories. This result is fundamentally incompatible with § 3553(a). By concentrating all offenders at or near the statutory maximum, § 2G2.2 eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and violates the principle, reinforced in *Gall*, that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct.

*Dorvee*, 616 F.3d at 186-87 (internal citations omitted).

The Court of Appeals for the Second Circuit has recognized the dearth of data on critical issues affecting risks, dangers, and appropriate sentences in these cases. *See, e.g.*, *id*. at 183 (finding error in sentencing court's "apparent assumption" concerning the link between possession of child pornography and risk of acting out); *United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008) (finding error in district court's reliance on defendant's history of sexual abuse of minor and general "proclivities" of child pornographers in finding probable cause to issue a search warrant in child pornography investigation); *see also United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008) (recognizing the difference in culpability between viewing and producing child pornography as well as the wide variation of sentences in child pornography cases); *R.V.*, 2016 WL 270257, at *23 (describing how "[a]utomatically equating non-production child pornography

offenders—people who possess, acquire or distribute images of child sexual exploitation—with pedophiles or child molesters is misleading.").

Following its holding in *Dorvee*, the Court of Appeals for the Second Circuit has consistently held that district courts are permitted to consider a broad, policy-based challenge to child pornography sentencing Guidelines in downwardly departing. *See, e.g.*, *United States v. Alhakk*, 505 F. App'x 51, 55 (2d Cir. 2012) ("[T]he court noted that it had given 'special consideration' to the concerns expressed in *Dorvee*. . . . Based on all of these considerations, the court concluded that a below-Guidelines sentence . . . was sufficient but not greater than necessary to fulfill the requirements of § 3553(a)."); *United States v. Chow*, 441 F. App'x 44, 45 (2d Cir. 2011) ("*Dorvee* recognizes district courts' post-*Booker* authority to 'vary from the Guidelines range based solely on a policy disagreement with the Guidelines,' and encourages courts to take seriously that discretion 'in fashioning sentences under § 2G2.2' for child pornography defendants.") (internal citations omitted); *United States v. Tutty*, 612 F.3d 128, 133 (2d Cir. 2010) ("[T]he district court should . . . bear in mind that the 'eccentric' child pornography Guidelines, with their 'highly unusual provenance,' 'can easily generate unreasonable results' if they are not 'carefully applied.'") (citing *Dorvee*, 604 F.3d at 98).

"Rationales for child pornography Guidelines for non-production offenses have been shredded." *D.M.*, 942 F. Supp. 2d at 352. A below-Guidelines sentence in the instant case is supported by concerns expressed by federal appellate courts and district courts, as well as the Sentencing Commission and the United States Department of Justice. It is recognized that the child pornography Guidelines are "fundamentally different from most and . . . , unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Dorvee*, 616 F.3d at 184. Acceptance of this fact enhances a sentencing court's ability to properly

comply with its duty to impose sentences that reflect the statutory goals of sentencing and are based on the required individualized assessment of the facts presented.

## VII.     Conclusion

A below-Guidelines sentence is appropriate in this case. A sentence principally of five years of probation is imposed with strict conditions of supervision and the requirement of continued treatment.


SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   May 19, 2016
        Brooklyn, New York